Cite as 2024 Ark. App. 320

# ARKANSAS COURT OF APPEALS
## DIVISION II
### No. CR-23-655

| | | |
|---|---|---|
| MINOR CHILD | | Opinion Delivered May 15, 2024 |
| | APPELLANT | APPEAL FROM THE BOONE COUNTY CIRCUIT COURT [NO. 05JV-20-11] |
| V. | | |
| STATE OF ARKANSAS | | HONORABLE DEANNA "SUZIE" LAYTON, JUDGE |
| | APPELLEE | AFFIRMED |

### WENDY SCHOLTENS WOOD, Judge

Minor Child (MC) appeals an order of the Juvenile Division of the Boone County Circuit Court granting the State's motion for extended juvenile jurisdiction (EJJ). On appeal, MC contends that the circuit court's decision was clearly erroneous. We affirm.

On February 7, 2020, the Boone County Sheriff's Department responded to a 911 call from a home located in Harrison. When officers arrived, they encountered fourteen-year-old MC and his ten-year-old brother (MW) standing outside. The officers entered the home and discovered the minor victim (MV), MC's sixteen-year-old brother, on the living room floor with a stab wound to his neck and MC's mother in a bedroom with multiple stab wounds to her body. MV died from his stab wound.

On February 11, the State filed a combined delinquency petition, request for EJJ designation, and motion for mental evaluation. The petition alleged that MC committed second-degree murder (Class A felony) when he stabbed MV causing his death and first-

degree battery (Class B felony) when he stabbed his mother multiple times causing serious physical injury. Pursuant to Arkansas Code Annotated section 9-27-502(a)(1) (Repl. 2020), the State requested that MC be evaluated for a lack of fitness to proceed. On May 18, the circuit court granted evaluations for fitness to proceed and lack of capacity pursuant to Arkansas Code Annotated section 9-27-502.

Dr. Benjamin Silber, PhD, performed the evaluation on August 1. He concluded that MC lacked a mental disease or defect but diagnosed him with attention deficit/hyperactivity disorder (ADHD), speech sound disorder, oppositional defiant disorder, and specific learning disorder with an impairment in reading, written expression, and mathematics. The examination also found that MC lacked some of the prerequisite capacities necessary for fitness to proceed due to a combination of limited intellectual functioning, ADHD, and developmental immaturity. MC's IQ was determined to be 76, which Silber identified as being in the fifth percentile and in the borderline range.

On October 6, an agreed not-fit-to-proceed commitment order was entered. MC was committed to detention for care and treatment "until restoration of fitness to proceed for a period not to exceed nine (9) months." The order provided that once MC was restored to fitness, the court would then determine whether MC had capacity as to criminal responsibility.

A second evaluation was performed by Dr. Silber on June 24, 2021, at which time Dr. Silber determined that MC had "regained fitness to proceed." In regard to criminal responsibility, Dr. Silber concluded that MC had the capacity to appreciate the criminality

2

of his conduct and to conform his conduct to the requirements of the law at the time of the alleged offenses.

On August 3, MC requested an additional fitness-to-proceed examination, which was granted by the court. The examination was performed on November 19 by Donala K. Jordan, PsyD, who opined that MC lacked the capacity to understand the proceedings against him and to effectively assist in his defense.

Following a fitness-to-proceed hearing, the circuit court entered an order on March 18, 2022, in which it adopted the findings and conclusions of Dr. Silber's June 24, 2021 report and found by a preponderance of the evidence that MC was fit to proceed, understood the charges and potential consequences, and understood the trial process. A criminal-responsibility hearing took place on February 15, 2023. In a March 16 order, the circuit court again adopted Dr. Silber's findings and found by a preponderance of the evidence that, at the time of the alleged offenses, MC had the capacity to possess the necessary mental state, conform his conduct to the requirements of the law, and appreciate the criminality of his conduct.

A hearing on the State's motion to request EJJ designation took place on June 29, at which time the circuit court received testimony from numerous witnesses including law enforcement officers; Susan Knight (MC's mother); Eric Christian (chief juvenile officer for Boone and Newton Counties); Amanda Childs (Community Service, Inc., where MC received mental-health services); Holly Foster (director of the juvenile detention center in Benton County); and Dr. Silber.

The circuit court entered an order on August 19, 2023, granting the State's request for EJJ designation. The circuit court considered the factors required by Arkansas Code Annotated section 9-27-503 (Repl. 2020) and made written findings:

6. The Court considered all the aforementioned factors in making its determination as follows:

(a) *The seriousness of the alleged offense and whether the protection of society requires prosecution as an extended juvenile jurisdiction offender.*

> The alleged offense is extremely serious as the offense includes the allegation of serious injury of one person and the death of a second person. Extended juvenile jurisdiction designation would provide for the protection of society in that sanctions would continue beyond the juvenile's eighteenth (18th) birthday, including incarceration within the Division of Youth Services and any further sentencing beyond adulthood as authorized by A.C.A. 9-27-506.

(b) *Whether the alleged offense was committed in an aggressive, violent, premeditated, or willful manner.*

> The offense, as described through the testimony given, was an aggressive and violent act and committed in a willful manner involving a weapon. The testimony of Susan Knight, mother of the defendant, was that the defendant came down with "something" and she felt a lot of pain upon being stricken by this object. Her recollection was she was struck in her bed and by the door. She testified she had been struck multiple times. She later determined the object as a knife. She saw the defendant in her room and he had stabbed her in the neck, back, and her front side. She recalled trying to get away and trying to make her way to the door but the defendant made it to the door first. As she walked around the room trying to think, the defendant remained by the door preventing her from exiting. As she went near the door, the defendant stabbed her. The defendant was holding the door closed. The defendant was stabbing her while trying to hold the door shut. The second victim, [MV], was trying to get the door open from the outside but didn't get it all the way open, there was a gap. She was trying to get the knife from the defendant and reached for the knife. The defendant jerked the knife away. That was when she heard the victim, [MV], scream. She was then able to get the knife from the defendant. During these events, the defendant made the statements that "she had to die" and "Don't worry mom I will take care of my brothers you don't

4

have to worry about them." As she dialed 911, the defendant saw her and then tried twisting her hair and choking her. The second victim was behind the door as described above. Susan Knight testified the Defendant brought the knife back in the struggle with her and she saw the victim, [MV] her other son, in the door. Captain Pemberton testified [MV] had a wound around his collarbone area consistent with the report he had a stab wound. The cause of death of the second victim, [MV], is identified in the medical examiner's report as "Stab Wound of Chest."

(c)*Whether the offense was against a person or property with greater weight being given to offenses against persons, especially if personal injury resulted.*

The alleged offense was against two persons as there are two alleged victims. One victim was stabbed several times and the second victim died.

(d) *The culpability of the juvenile, including the level of planning and participation in the alleged offense.*

The defendant was the person who allegedly stabbed the deceased victim and his mother. The statements set forth above, under paragraph 6(b), provides his participation in the alleged offenses as he is the only named defendant alleged to have committed the acts for which he is charged. The defendant's statements to his mother, a victim, was that "she had to die and I would take care of my brothers." It is alleged the defendant initially stabbed his mother while she was in bed and continued to pursue stabbing her once she stood up from her bed. She testified that she does not believe it was an accident that the defendant stabbed her. She described him as not being angry or screaming or yelling and was able to make the statement about taking care of his brothers. All the above demonstrates, from the evidence presented, the juvenile was aware of his actions and acted alone.

The testimony also reflected, as to the deceased victim, [MV] that his injuries resulted when he attempted to enter the room where the defendant was stabbing his mother. In the process of stabbing the mother, the defendant jerked his hand which held the knife. After the defendant jerked his hand back, [MV] screamed. The mother stated the defendant jumped at the time of the scream and she was able to loosen the defendant's hold on the knife and retrieve the knife from his hand. The actions of the defendant caused serious physical injury to his mother and caused injury to a second victim, [MV], for which the second victim died. See 6(b)

5

(e) *The previous history of the juvenile, including whether the juvenile had been adjudicated delinquent, and if so whether the offenses were against persons or property and any other previous history of anti-social behavior or patterns of physical violence.*

> The defendant has no prior criminal history and has never been adjudicated a juvenile offender. As to pattern of physical violence, there was none identified.

> The mother testified she was never worried about harm from the defendant before and only one physical fight had ever occurred between the defendant and the deceased victim.

> The defendant was in special needs classes at school and all his friends were special needs. She stated he had been mainstreamed in both schools at Green Forrest and Valley Springs. The defendant broke a window at some point in the past at the Valley Springs school.

> While the defendant needed assistance in school toward the education process, there is no pattern of anti-social behavior or history of anti-social behavior that have been shown.

(f) *The sophistication and maturity of the juvenile, as determined by consideration of the juvenile's home, environment, emotional attitude, pattern of living or desire to be treated as an adult.*

> The juvenile was 14 years of age at the time of the alleged offense. As to the juvenile's desire to be treated as an adult, see the statements made by the defendant at the time of the alleged crime as set out above in 6(d). He made statements of his intent to assume the primary caregiver role as if he were mature enough to do so. During the commission of the alleged crime, his emotional attitude, through his statements set forth in paragraph 6(d) above, was one of causing injury to one victim and the resulting death of a second victim. Also, of note is that the Defendant was the one who called 911 following the stabbings.

> The defendant has been described by witnesses as immature. See paragraph 6(i). The mother described the defendant as being delayed since birth on each developmental milestone. He is identified as having communication issues all his life. He did receive occupational therapy and physical therapy for most of his life. He has received speech therapy for the last 3 years. She stated the defendant does not feel pain like others do. An example given was when he

6

removed his calluses with a needle and did not feel the pain and he had also cut his chest once when he was small. He currently takes medication although his current diagnoses were unknown to the mother. His diagnoses for the time frame since the alleged crime are set out in paragraph 6(i). Dr. Silber identified the juvenile as having no mental disease or defect at the time of his two psychological evaluations. His immaturity was described as one of social/emotional immaturity related to the defendant's overall demeanor. Despite these factors and his age, he is the party who called 911 after he had allegedly stabbed his mother and brother.

The mother described his relationship with his brothers as close. His mother's testimony was that he was "different" "just different."

No further explanation was given other than those set forth herein to further reflect any deficits in his home, environment or pattern of living.

(g) *Whether there are facilities or programs available to the Court that are likely to rehabilitate the juvenile prior to the expiration of the court's jurisdiction.*

Given his current age, he would be limited regarding what rehabilitation programs might be available to him at his age. He is just shy of the age of 18. The Division of Youth Services would be an option until the age of twenty-one (21), if deemed appropriate, and allow the Defendant to be subject to further sentencing options as an adult if an extended juvenile jurisdiction offender. The Juvenile Officer testified he did not believe juvenile treatment programs would be available to him once he turns eighteen (18) years of age, other than the Division of Youth Services.

(h) *Whether the juvenile acted alone or was part of a group in the commission of the alleged offense.*

According to the testimony and evidence presented, the juvenile acted alone in the commission of the alleged offense.

(i) *Written reports and other materials relating to the juvenile's mental, physical, educational and social history.*

The Court considered the testimony of other witnesses, specifically, Ms. Childs, former therapist for the juvenile from the year 2020 through October 2022, Ms. Foster, director of the juvenile detention center in Benton County, Arkansas, and Dr. Benjamin Silber, PhD.

Ms. Childs testified related to her time as the defendant's therapist. She identified the defendant as having problems tracking conversations initially due to his lack of focus. He exhibited signs of Attention Deficit Hyperactivity Disorder and had behavioral struggles in relationships. She noted the Defendant did participate in therapy but sometimes struggled due to his mental health and cognitive issues. There had been some references to visual hallucinations and some reference to a trauma history of witnessing or being around abuse. Further, as to the hallucinations, she could not recall how many times those had been brought up in her sessions with the defendant but it was more frequent in the beginning of the therapeutic relationship. She did recall the defendant reporting he saw images "further away" and was preoccupied with thoughts of this including drawing images related to same. She stated there were no reports of him interacting with what he stated he saw; however, he never could identify that it wasn't real.

Ms. Foster testified the challenges she saw in the defendant were his speech and trying to keep the defendant motivated and stimulated to prevent him from obsessing over certain things that became his focus and interest. She confirmed he received speech therapy at the detention center. He is reported to be able to transition from the classroom when he gets frustrated in the classroom and to take steps to ask the teacher for permission to leave the classroom. He is identified "as doing what he is supposed to do." The defendant has never been violent at the detention facility and wants to go on to college to become a video game maker. She believes he will need assistance with adult responsibilities.

Further, she testified he displays some symptoms of what she described as "autism." During his stay at their facility, he has hit his milestones educationally and never missed hitting weekly education goals. She described him as reasonable. She states he can be deescalated if he is given time to calm down when he is upset. After time to cool down is given, he becomes rational rather than irrational. She also described him as funny and observant. An example given was his calling out to people and staff when they don't follow the rules. She testified he is capable of following the rules and remembering the rules. He exhibits more patience presently than when he first came into their program.

Also testifying was Dr. Benjamin Silber. He had previously conducted two evaluations of the Defendant. The first evaluation took place on August 11, 2020. The second evaluation was on June 24, 2021. Dr. Silber testified the

defendant's diagnoses remained the same from the first evaluation to the second. Those diagnoses are Attention Deficit Hyperactivity Disorder, Speech Sound Disorder, Oppositional Defiance Disorder, and Specific Learning Disorder with impairments in reading, math, and written expression.

The finding of the first evaluation was Not Fit to Proceed based on immaturity. The factors considered were the defendant's Attention Deficit Hyperactivity Disorder described as significant at that time, his limited intellectual functioning with an IQ of 76 and maturity development or immaturity. As to maturity, Dr. Silber stated his biggest concern was the defendant's social/emotional immaturity as it related to his overall demeanor. As to the Attention Deficit Hyperactivity Disorder, he testified it was high at the first evaluation but much better after treatment at the Arkansas State Hospital. He stated the Defendant denies that Slender Man had anything to do with this alleged crime and denied intentionally harming his brother. Dr. Silber was aware of the reference to Slender Man figure due to the mother contacting Arkansas State Hospital regarding same. He testified the Defendant was not open to discussing any further information about the case. He stated there was no indication, at the Defendant's two evaluations, that he had any mental disease or defect.

(j) *Any other factors deemed relevant by the judge.*

There were no other factors that the Court deemed relevant that have not been stated herein.

The order further provided that an EJJ offender adjudication was scheduled for the week of October 2. MC filed an interlocutory appeal from the EJJ designation on August 27.

An "extended juvenile jurisdiction offender" is defined as a juvenile designated to be subject to juvenile disposition and an adult sentence imposed by the circuit court. Ark. Code Ann. § 9-27-303(22) (Repl. 2020). The State may request an EJJ designation if the juvenile who is fourteen or fifteen years of age at the time of the alleged offense is charged with second-degree murder under section 5-10-103 or first-degree battery under section 5-13-201. The party requesting the EJJ designation has the burden to prove by a preponderance of the

9

evidence that such a designation is warranted. Ark. Code Ann. § 9-27-503(b). The circuit court is required to make written findings, and it must consider the following factors when deciding whether to designate a juvenile as an EJJ offender:

(1) The seriousness of the alleged offense and whether the protection of society requires prosecution as an extended juvenile jurisdiction offender;

(2) Whether the alleged offense was committed in an aggressive, violent, premeditated, or willful manner;

(3) Whether the offense was against a person or property, with greater weight being given to offenses against persons, especially if personal injury resulted;

(4) The culpability of the juvenile, including the level of planning and participation in the alleged offense;

(5) The previous history of the juvenile, including whether the juvenile had been adjudicated delinquent and, if so, whether the offenses were against persons or property and any other previous history of antisocial behavior or patterns of physical violence;

(6) The sophistication and maturity of the juvenile, as determined by consideration of the juvenile's home, environment, emotional attitude, pattern of living, or desire to be treated as an adult;

(7) Whether there are facilities or programs available to the court that are likely to rehabilitate the juvenile prior to the expiration of the court's jurisdiction;

(8) Whether the juvenile acted alone or was part of a group in the commission of the alleged offense;

(9) Written reports and other materials relating to the juvenile's mental, physical, educational, and social history; and

(10) Any other factors deemed relevant by the court.

Ark. Code Ann. § 9-27-503(c).

For purposes of appeal, a designation order is a final, appealable order and shall be subject to an interlocutory appeal. Ark. Code Ann. § 9-27-503(f). This court will not reverse the circuit court's order unless it is clearly erroneous. *See A.M. v. State*, 2019 Ark. App. 357, at 5, 584 S.W.3d 253, 257. A finding is clearly erroneous when, although there is evidence supporting it, the reviewing court on the entire evidence is left with a firm conviction that a mistake has been committed. *Id.* at 5, 584 S.W.3d at 257. There is no requirement that proof be introduced against the juvenile on each factor, and the circuit court is not obligated to give equal weight to each of these factors. *Id.*, 584 S.W.3d at 257.

On appeal, MC contends that the circuit court's EJJ designation was clearly erroneous. MC first argues that the circuit court failed to afford the proper weight to MC's mental-health issues and maturity, which are factors (6) and (9). Contrary to MC's contention, the circuit court discussed MC's mental health and maturity in detail under both factors. The circuit court noted MC's statements to his mother during the stabbings that "she had to die" and that he would take care of his siblings as well as the fact that he called 911 after the stabbings. The circuit court attributed these facts as indicative of MC's desire to be treated as an adult. The circuit court also recognized the witnesses' descriptions of his immaturity, developmental delays, numerous diagnoses including ADHD, and IQ. And while initially Dr. Silber concluded that MC was not fit to proceed at the first evaluation, when reevaluated, Dr. Silber concluded MC was fit to proceed.

MC, referencing factors (1), (5), (7), and (9), argues that the circuit court should have afforded more weight to the facts that he had no previous criminal history and had never

been violent towards another individual before or after this incident, even while in juvenile detention. He states that this is "incredibly rare and should hold significant weight when discussing the potential penalties necessary to ensure rehabilitation of a juvenile offender." In its written findings, the circuit court considered MC's lack of prior criminal history, pattern of violence, and antisocial behavior as well as MC's behavior in juvenile detention. MC's argument presumes the circuit court did not afford significant weight to these factors because it granted EJJ designation. However, granting EJJ designation is not clearly erroneous simply because some evidence weighed in MC's favor. *See, e.g.*, *Shaw v. State*, 2023 Ark. App. 55, at 8, 660 S.W.3d 591, 597 (the denial of a juvenile-transfer motion is not clearly erroneous simply because some evidence might weigh in favor of granting the motion).

MC further argues that the killing of MV was accidental, citing factor (2). Admittedly, MC makes the assumption that the State's request to seek EJJ designation was due to the second-degree-murder charge for killing his brother and not the battery charge for stabbing his mother. Factor (2) is whether the alleged offense was committed in an aggressive, violent, premeditated, or willful manner, not whether it was an accident. Although MC argues that the facts show that MV died due to an accidental stab wound, the circuit court found that the "offense, as described through the testimony given, was an aggressive and violent act and committed in a willful manner involving a weapon." Moreover, MC's mother's testimony about the battery supports the circuit court's finding, and MV was killed from a stab wound to his neck while attempting to help his mother.

MC next contends that the circuit court failed to give adequate weight to the testimony that his mother's stabbing may have been influenced by MC's belief in "Slender Man," citing factors (9) and (10). However, the circuit court considered MC's interest in Slender Man and noted Dr. Silber's testimony that MC denied that Slender Man had anything to do with MC's alleged crimes.

In conclusion, we hold that the circuit court's grant of the State's motion for EJJ designation was not clearly erroneous. The circuit court, as required by the statute, considered each factor and made written findings on each, which are supported by the evidence. MC's arguments are simply a request for this court to reweigh the factors considered by the circuit court. We will not reweigh the evidence on appeal, and the circuit court is not required to give equal weight to each factor. *Walton v. State*, 2020 Ark. App. 318, at 9–10, 602 S.W.3d 754, 759. We therefore affirm the circuit court's grant of the State's motion for EJJ.

Affirmed.

ABRAMSON and GRUBER, JJ., agree.

*Short Law Firm*, by: *Lee D. Short*, for appellant.

*Tim Griffin*, Att'y Gen., by: *A. Evangeline Bacon*, Ass't Att'y Gen., for appellee.